IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

LUZ MARTÍNEZ-ÁLVAREZ and TONY
MARTÍNEZ-TAVERAS,

        Plaintiffs

           v.

RYDER MEMORIAL HOSPITAL, INC.,
et al.,

        Defendants

CIVIL NO. 09-2038 (JP)

## OPINION AND ORDER

Before the Court are several motions filed following the trial in the instant case. For the reasons stated herein, the Court hereby: **GRANTS** Plaintiffs' motion to amend the Judgment (No. 157); **DENIES** Plaintiffs' motion for express finding of obstinacy (No. 162); **GRANTS** Defendants' motions for remittitur (Nos. 163, 181, 185, and 186);[1] **DENIES** Defendants' motions for judgment as a matter of law pursuant to Rule 50(b) or new trial pursuant to Rule 59 (Nos. 163, 181, 183, 185); **DENIES** Defendant Ryder Memorial Hospital, Inc.'s ("Ryder") motion for relief from judgment pursuant to Rule 60(b)(4) (No. 182); and **DENIES** Defendant Ryder's motion to alter judgment pursuant to Rule 59(e) (No. 184).

---

1.    Defendants' motions requesting remittitur address additional issues on which different rulings have been reached. As such, these motions are only granted as to the remittitur requests.

CIVIL NO. 09-2038 (JP)            -2-

## I.    PROCEDURAL BACKGROUND

Plaintiffs Luz Martínez-Álvarez ("Luz Martínez" or "Luz") and Tony Martínez-Taveras ("Tony Martínez" or "Tony") filed the instant action alleging negligence on the part of Defendants Ryder, Dr. Griselle Pastrana ("Pastrana"), Dr. Enrique Octavio Ortiz-Kidd ("Ortiz"), and Dr. Juan Gómez-López ("Gómez"). Plaintiffs' claims arise from medical treatment administered to their late father, Adalberto Martínez-López ("Adalberto Martínez" or "decedent"), at Ryder in January 2001. Plaintiffs' claims were brought pursuant to Articles 1802 and 1803 of the Civil Code of Puerto Rico, P.R. Laws. Ann. tit. 31, §§ 5141-5142.

An Initial Scheduling Conference ("ISC") was held on January 28, 2010 (No. 54). At said conference the parties discussed settlement but were unable to reach an agreement. Accordingly, the Court set dates for the remainder of the litigation including trial. Little discovery was needed because separate actions arising out of the same facts as this case had already been litigated.

The parties met with the Court for a Pretrial Conference (No. 126) on May 28, 2010, at which the parties and the Court discussed and agreed upon the voir dire questions, jury instructions, and verdict form. The Jury Trial began on June 1, 2010, and concluded on June 16, 2010 when the Jury returned a verdict (No. 148) finding liability on behalf of each of the Defendants. The Jury awarded damages of $4,000,000.00 to Plaintiff Luz Martínez,

CIVIL NO. 09-2038 (JP)            -3-

$1,000,000.00 to Plaintiff Tony Martínez, and $2,000,000.00 for the suffering of decedent Adalberto Martínez.  The Jury attributed the fault for the damages caused as follows: Ryder: 70%, Ortiz: 20%, Pastrana: 5%, and Gómez: 5%.  The Court entered Judgment (No. 156) in accordance with the Jury Verdict on June 17, 2010.  The Court also entered a Supplemental Judgment (No. 158) on June 18, 2010, awarding attorneys' fees to Plaintiffs.  Following trial, the parties filed the motions and oppositions that are the subject of the instant Opinion and Order.[2]

## II.  <u>UNCONTESTED FACTS</u>

The following uncontested facts were agreed to by the parties, and provided to the Jury during trial.  The uncontested facts were originally discussed at the ISC, and were subsequently amended at the request of the parties on the basis of issues raised during and immediately prior to trial.  The final version was agreed upon by all parties, as follows:

1.   Luz Martínez-Álvarez is of legal age.  Luz is the daughter of the late Adalberto Martínez-López.

2.   Tony Martínez-Taveras is of legal age.  Tony is the son of the late Adalberto Martínez-López.

---

2.    The Court **DENIES** Defendant Ryder's motion (**No. 198**) to strike Plaintiffs' consolidated opposition.  The Court holds the parties to strict standards of timeliness, but finds that in light of the volume of motions filed by Defendants, and the fact that the current Federal Rules of Civil Procedure permit significantly more time to prepare post-trial motions than to oppose them, Plaintiffs' delay of two days is excusable.

CIVIL NO. 09-2038 (JP)            -4-

3.   Dr. Griselle Pastrana (Dr. Pastrana), is a Doctor in Medicine duly authorized to practice her profession in Puerto Rico.

4.   Dr. Pastrana is not an Emergency Medicine specialist and she was the physician who treated the late Adalberto Martínez-López at Ryder's Emergency Room on January 16, 2001.

5.   Dr. Enrique Octavio Ortiz-Kidd (Dr. Ortiz-Kidd), is a Doctor in Medicine, duly authorized to practice his profession in Puerto Rico. On the day of the events that give rise to this case, Dr. Enrique Ortiz-Kidd had medical staff privileges at Ryder. Adalberto Martínez-López was admitted to Ryder Memorial Hospital under the services of Dr. Enrique Ortiz-Kidd.

6.   Dr. Juan Ramón Gómez-López, is a Doctor in Medicine, duly authorized to practice his profession in Puerto Rico. On the day of the events that give rise to this case, Dr. Gómez-López had medical staff privileges at Ryder.

7.   Dr. Luis Canetti is a Doctor in Medicine duly authorized to practice his profession in Puerto Rico. On the day of the events that give rise to this case, Dr. Canetti had medical staff privileges at Ryder. In response to a consultation from Dr. Enrique Ortiz-Kidd, Dr. Canetti examined Adalberto.

8.   By January 16, 2001, Adalberto Martínez-López (Adalberto), was Dr. Ortiz-Kidd's patient at Instituto Renal del Este. He suffered chronic kidney disease in end stage or stage V. He had undergone dialysis since 1988.

CIVIL NO. 09-2038 (JP)          -5-

9.   On January 16, 2001, at approximately 6:45 p.m., Adalberto –a 57 year old end stage renal disease dialysis patient with high blood pressure and Hepatitis C– arrived at Ryder's Emergency Room complaining of bleeding from the femoral dialysis catheter and chest pain.

10.  Mr. Adalberto Martínez came to the hospital accompanied by his daughter, Luz Martínez, who happened to be a graduate nurse working for Ryder Memorial Hospital, Inc., at Casa de Salud.

11.  His vital signs were: temperature: 36.5, pulse: 68, respiratory rate: 23 and blood pressure: 200/70.

12.  Adalberto was examined at Ryder's Emergency Room by codefendant Dr. Griselle Pastrana at 6:50 p.m.

13.  Dr. Pastrana documented, among other things, that Adalberto was actively bleeding from the catheter site, had weakness, dizziness and a hemoglobin of 6.5.  Also, his pre-existing condition of high blood pressure, hepatitis C and his end stage renal disease.  Upon evaluation she found the patient to be alert, oriented, mildly pale and chronically ill.  The lungs were clear to auscultation.  The heart, with regular rhythm and no murmur.  She also ordered Oxygen at three liters per minute by nasal canula.

14.  At 6:50 p.m. Dr. Pastrana entered a series of orders, to wit: CBC with differential-STAT, Hematocrits-STAT, SMA & Arterial Blood Gases-STAT, Oxygen by nasal canula at three liters per minute,

CIVIL NO. 09-2038 (JP)          -6-

Chest x-ray portable, EKG, ProTime, PTT/INR, Cardiac enzymes, Liver profile and type and cross for four units of Packed Red Blood Cells.

15.  At 7:30 p.m., Dr. Pastrana discussed Adalberto's case with codefendant Dr. Enrique Ortiz-Kidd, who, on the telephone ordered the patient's admission to the hospital under his services.

16.  Adalberto was ordered admitted to Ryder Hospital at approximately 7:39 p.m. and he was placed under the care of codefendant Dr. Ortiz-Kidd with the following/orders given by him: blood transfusions with dialysis the next day (January 17th, 2001, a.m.). Also, strict bed rest, renal diet (.87 m Eq of Sodium), vital signs each four hours and chart, Type and Cross for four units of Packed Red Blood Cells (PRBC), arterial blood gases, CBC and Differential,SMA7, cardiac enzymes, PT/PTT/INR, Liver Profile, Oxygen by nasal canula at three liters per minute, hemo-dialysis tomorrow am, transfuse three units of PRBC during hemodialysis tomorrow with dialyzer F 8 (no heparin), chest plate (portable), electrocardiogram and Norvasc 5 mg (for blood pressure).

17.  At 9:30 p.m. Adalberto arrived at the Medicine Floor where, once again, it is documented that he was admitted due to bleeding from the graft.

18.  It is further documented that he was pale, alert, feverish with edema, slight respiratory distress, chest pain and weakness.

CIVIL NO. 09-2038 (JP)          -7-

19.  At 10:00 p.m. Adalberto remained feverish and the on duty nephrologists is contacted and appraised about his temperature and blood pressure that stands at 160/70.

20.  At 10:20 p.m. Dr. Baquero (Dr. Ortiz-Kidd's partner) prescribed to Adalberto two Tylenol tablets of 500 mg, heparin lock, Vancomycin (antibiotic) and a blood culture.

21.  On January 17, 2001, at 12:15 a.m. codefendant Ortiz-Kidd gave a telephone order consisting of the following: (1) apply pressure on area of the bleeding and change the bandage, (2) NSS .9 over incision area, and (3) type and cross for four units of frozen plasma and transfuse in the morning with dialysis.

22.  At 1:00 a.m., Adalberto's temperature was 39, pulse 70, breathing 22 and blood pressure 100/60.

23.  At 4:55 a.m., the nursing staff reported that Adalberto was bleeding profusely and Dr. Ortiz-Kidd is contacted again by telephone.

24.  This time Dr. Ortiz-Kidd ordered by telephone a consultation with Dr. Sotomayor, and ordered to apply a lot of pressure to the bleeding area.

25.  At 5:00 a.m., Adalberto's vital signs were blood pressure 100/60, pulse 90, respiratory rate 24, temperature 37 and he continued intermittently bleeding.

26.  The nurse supervisor was called and given a report and a Dr. Gómez was called to see Adalberto.

CIVIL NO. 09-2038 (JP)          -8-

27.  At 5:30 a.m. Dr. Ortiz-Kidd was called again and he requested a consultation with Dr. Canetti, another surgeon.

28.  The lab reported that it had frozen plasma available at 5:30 a.m. on January 17.

29.  At 6:35 a.m. the fresh frozen plasma transfusion began following the administration of two 500 mg Acetaminophen tablets -Adalberto had a body temperature of 39 degrees- ordered by co-defendant Dr. Gómez.

30.  On January 17 at 6:35 a.m., Dr. Canetti sees the patient reports no bleeding at the moment and recommends transfer to Auxilio Mutuo as soon as possible for A-V fistula revision, since he is not a vascular surgeon. Upon removing the bandage the nurses report that the bleeding continues profusely and abundantly. New bandages are placed and pressure is applied to the area.

31.  At 6:45 a.m. Adalberto was reported to be in delicate condition.

32.  At 7:00 a.m. codefendant Ortiz-Kidd is notified about the urgent need to transfer Adalberto.

33.  At 7:05 a.m. Adalberto continues in delicate condition. The patient is reported undergoing the transfusion of frozen plasma.

34.  At 8:00 a.m. the nurses ascertain that Adalberto is not breathing.

35.  It is then that Adalberto is connected to the monitor and CPR is performed to no avail.

CIVIL NO. 09-2038 (JP)          -9-

36. At 8:15 a.m. Dr. Dones pronounced Adalberto dead.

37. Mr. Martínez underwent dialysis on the unit of Humacao of the Instituto Renal del Este on January 15, 2001.

38. The nurse did not see any evidence of bleeding on the clothes of Mr. Martínez.

III. **ANALYSIS**

    A. **Defendants' Motions for Remittitur**

Each of the Defendants moves (Nos. 163, 181, 185, and 186)[3] the Court to order a reduction of the amount of damages awarded in the Jury Verdict. Plaintiff opposes (No. 196) Defendants' requests for remittitur. The Court will now consider the parties' respective arguments.

        1. **Legal Standard for Remittitur**

An award of damages may not be reduced because it is extremely generous or because the Court would have found the damages to be considerably less. Koster v. Transworld Airlines, Inc., 181 F.3d 24, 34 (1st Cir. 1999). However, a damage award should be reduced if it is "so grossly disproportionate to any injury established by the evidence as to be unconscionable as a matter of law." Id.; Whitfield v. Meléndez-Rivera, 431 F.3d 1, 16 (1st Cir. 2005). A district court should only grant a motion for

_____

3. Defendants' motions and Plaintiffs' consolidated opposition address several different issues. This section of the Opinion and Order addresses only the requests for remittitur.

CIVIL NO. 09-2038 (JP)            -10-

remittitur if "the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." <u>Monteagudo v. Asociación de Empleados del Estado Libre Asociado</u>, 554 F.3d 164, 174 (1st Cir. 2009).

### 2.    Testimony Regarding Damages

In the instant case, Plaintiffs presented evidence to support the Jury's finding that Defendants' actions and omissions caused Adalberto Martínez's untimely death.  Plaintiffs also presented testimony from Luz Martínez and Tony Martínez regarding effects that the loss of their father had upon each of them.  With regard to Luz's suffering, Plaintiffs offered additional testimony from Dr. Jorge Suria-Colón, a psychiatrist who examined Luz in order to assess her condition following the death of her father.

### i.    Luz Martínez's Damages

Luz Martínez testified that she was with her father when he went to Ryder the day before his death.  Around 6:00 p.m. that day, she received a call from her mother, who informed Luz that her father was bleeding from the site of his dialysis catheter.  Luz went to pick up her mother and father and take them to the hospital.  She testified that her father asked to be taken to Ryder because it was nearby and because Luz worked there.

Throughout the evening and early morning, Luz remained in the hospital observing her father's deteriorating condition.  She gave detailed testimony regarding her efforts to obtain help from the

CIVIL NO. 09-2038 (JP)            -11-

nurses and doctors at Ryder.  Luz testified that her father attempted
to reassure her that he would be alright.  She observed his ongoing
bleeding  and  continued  to  seek  assistance  in  the  morning  when
Dr. Canetti arrived.  Finally, Luz learned that her father had died.

Luz also testified that she had a very close relationship with
her  father.   They  spent  holidays  together,  including  always
celebrating the new year at Luz's home.  Adalberto Martínez was very
fond of Luz's children.  When Luz faced a medical issue of her own
in 1990, her father supported her and helped her walk while she was
recovering from a procedure to remove a tumor.

After Adalberto Martínez's death, Luz has coped with mental and
emotional  suffering  resulting  from  the  loss  of  her  father.   She
testified that she now works at a hospital in Florida.  When she is
reminded of the circumstances surrounding her father's death, her
emotional pain is exacerbated.  She testified that she is reminded
of her father when she attends family gatherings and when she hears
the type of music that he liked.

### ii.  Tony Martínez's Damages

Tony Martínez testified that when he was growing up he saw his
father approximately three or four times each year.  Tony's father,
Adalberto Martínez, was not married to Tony's mother.  As explained
by Luz Martínez in her testimony, Adalberto Martínez was married to
Luz's mother, Providencia Álvarez, when he had an affair with Tony's
mother.  Luz's mother was able to forgive her father, and he returned

CIVIL NO. 09-2038 (JP)          -12-

to their household.  However, after Adalberto Martínez had another affair, the couple divorced.  Luz described the divorce as a "paper divorce," because the couple continued to see each other despite being legally divorced.

Tony lived in several locations during his childhood and adolescence, including New York, the Dominican Republic, and Puerto Rico.  Although he and his father were usually not in the same location, Tony testified that he saw his father as his mentor.  In particular, he recalled a time while he was in high school in New York when he was having trouble in school.  Tony's father called his mother, and convinced her to send Tony to be with his father.  During that time period, Adalberto Martínez took Tony to and from school each day and got him back on the right track.

Tony further testified that as an adult he has been stationed in various countries for his military service.  When Tony learned of his father's death, he was stationed in Germany.  He had spoken with his father via webcam just two days earlier, and was surprised, angry, sad, and upset when he heard the news.  Tony attended his father's funeral and helped carry the casket.  He testified that the loss of his father upset him, and remains a difficult topic for him and his siblings to discuss.

### iii. Adalberto Martínez's Damages

Plaintiff Luz Martínez testified that she brought Adalberto Martínez to the emergency room at Ryder on January 16, 2001.  She

CIVIL NO. 09-2038 (JP)          -13-

also testified that when Defendant Pastrana evaluated him, he was bleeding from the area of his dialysis catheter, and had difficulty breathing.  During the time that he remained in the emergency room, Adalberto Martínez was not reevaluated.  Subsequently, he was transferred to the medicine floor.  Luz described his condition during this period of time as deteriorating.  He continued bleeding, having difficulty breathing, and complained of chest pains.  Luz further testified that the medical personnel at Ryder did not stop her father's bleeding.

Luz Martínez also stated that throughout the time at Ryder, her father was conscious all of the time.  Adalberto Martínez attempted to reassure Luz by telling her not to worry, that the blood would arrive in a little while.  He said they will give me my transfusion in a little while and the doctor will appear in a little while. Luz's brother kissed their father and said goodbye to him.[4] Adalberto Martínez again attempted to be reassuring about the situation.

### 3.   Adequacy of Evidence to Support Verdict

The evidence presented by Plaintiffs supports a finding that Luz Martínez, Tony Martínez, and decedent Adalberto Martínez suffered damages as a result of Defendants' negligence.  Indeed, the mental and emotional anguish experienced by each of them was severe.  Any

---

4.    The brother Luz Martínez referred to during this portion of her testimony is not a party to the instant action.

CIVIL NO. 09-2038 (JP)              -14-

loss of a parent would result in great anguish to a child.  In this case that pain is exacerbated by the feelings by Luz and Tony that their father died needlessly and before his time.  Adalberto Martínez also suffered severe anguish as he lay in the hospital bed aware of the fact that his condition was deteriorating.  Although he may have projected confidence to reassure his children, the reality of the situation was that he had to observe his own demise.

The Jury in the instant case awarded a total of $7,000,000.00 in damages.  The award consisted of $4,000,000.00 for damages suffered by Luz Martínez, $1,000,000.00 for damages suffered by Tony Martínez, and $2,000,000.00 for damages suffered by Adalberto Martínez.  The $7,000,000.00 total amount awarded in this case is high relative to other similar cases.[5]  For example, in a case involving a fifty six year old husband and father of three adult children, who died due to internal bleeding resulting from an

---

5.    See also Reetz v. OH, M.D. and López, M.D., 2007 WL 4823580, February, 2007 (Ill. State Ct.) (awarding $1,251,137.00 total, $400,000.00 of which was for pain and suffering, in case involving 61 year old father of two); Hart v. Cua, M.D. and Quirk, M.D., 2004 WL 5520379, January, 2004 (Mass. State Ct.) (awarding $2,275,568.00 for pain and suffering in case involving 65 year old father of eight); Garza-Muniz v. Mcallen Hospitals LP and Rashid, M.D., 2006 WL 6192213, February, 2006 (Tex. State Ct.) (awarding $500,000.00 in case of death of father of unspecified age, survived by spouse and three children); Priscilla Outcault and Martha Outcault v. Gregory Bazylewicz, M.D., et al., 2007 WL 4948011, September 20, 2007 (Mass. Super. Ct.) (awarding $1,000,000.00 for pain and suffering in case involving death of 47 year old father of two); Barbee v. Yarbrough, M.D. and The Queen's Medical Center, 2006 WL 6450846, April, 2006 (Haw. State Ct.) (awarding $1,095,000.00 in case involving death of 76 year old father of three); Griffin v. Lee, D.O. and Midwest Physician Group, Ltd., 2004 WL 4400768, March 2004 (Ill. State Ct.) (awarding $750,000.00 in case involving death of mother of unspecified age, survived by two children, where defendant doctor allegedly failed to appear at hospital when told of patient's deteriorating condition); Tate, Estate Of v. Barnes-Jewish Hospital, 2005 WL 5187929, September, 2005 (Mo. State Ct.) (awarding $1,933,704.00 in case involving death of 70 year old mother of two).

CIVIL NO. 09-2038 (JP)          -15-

improper diagnosis of his liver condition, the jury awarded $1,000,000.00 in damages for pain and suffering. <u>Estate of Peraza v. Ornstein, M.D.</u>, 2005 WL 404214, August 2005 (Fla. State Ct.). In a Massachusetts case involving the death of a fifty one year old husband and father of four adult children where the defendant negligently failed to diagnose a critical heart condition, the jury awarded a total of $542,505.00. <u>Estate of Alexander Costello v. Leslie S. Fang, M.D.</u>, 1998 WL 1754124, June 25, 1998 (Mass. Super.). In said case, less than half of the total verdict amount was for pain and suffering.[6] <u>Id.</u>

Though these cases have similarities with the instant case, they arise from different jurisdictions, and have some factual distinctions from the instant case. In Defendants' motions for remittitur and Plaintiffs' opposition, the parties cite to various other cases to support their respective positions as to the amount of damages.[7] However, these cases also do not drive the result in

---

6.   For an aggregation of nationwide damages awards in medical malpractice cases, <u>see</u> Public Citizen's Congress Watch, <u>The Great Medical Malpractice Hoax: NPDB Data Continue to Show Medical Liability System Produces Rational Outcomes</u> (January 2007) (finding that medical malpractice judgments over $1 million constitute less than one percent of the total number of payments, and that in 2005 the median payment for cases involving death was $195,000.00.)

7.   For example, the parties cite cases including <u>Correa v. Hospital San Francisco</u>, 69 F.3d 1184 (1st Cir. 1995) (finding that award of $700,000.00 was not excessive in case involving death of sixty-five year old mother with three surviving children and four grandchildren); <u>Nievez Cruz ex rel. Hernández Nieves v. Universidad de Puerto Rico</u>, 151 D.P.R. 150 (P.R. Supr. Ct. 2000) (reducing award of $3,985,000.00 to $1,987,500.00 in case of minor that was permanently disabled as a result of events that took place during childbirth process); <u>Havinga v. Crowley Towing and Transp. Co.</u>, 24 F.3d 1480 (1st Cir. 1994) (finding that award of $1,550,000.00 for pain and suffering not excessive).

CIVIL NO. 09-2038 (JP)          -16-

the instant case.  As established by the United States Court of
Appeals for the First Circuit, the "paramount focus in reviewing the
damage award must be the evidence presented at trial."  Whitfield,
431 F.3d at 16 (internal quotations omitted).  Similarly, the Court
"will not disturb a jury award merely because the amount of the award
is somewhat out of line with other cases of a similar nature."  Id.

    As such, the Court must focus on the specific facts presented
at trial and determine whether the amount awarded is "against the
clear weight of the evidence such that upholding the verdict will
result in a miscarriage of justice."  Monteagudo, 554 F.3d at 174.

    In the instant case, there were a number of facts weighing
against such a massive award.  With regard to both Tony Martínez and
Luz Martínez, their testimony indicated that both are continuing to
lead relatively normal lives and pursue successful careers as a
military officer and nurse, respectively.  Luz testified that she
works as a nurse in Florida.  Tony testified that since the loss of
his father he has continued to successfully obtain increasingly
higher ranks within the military.

    In addition, the Court notes that while losing a family member
before their time is always tragic, losing a parent of a somewhat
advanced age is different from cases involving the untimely death of
a young parent or the death of a child.  Both Plaintiffs in the
instant case were adults when they lost their father.  They were
unjustly deprived of further years of enjoyment of their time with

CIVIL NO. 09-2038 (JP)          -17-

their father and must be compensated for that severe loss.  However, due consideration must be given to the fact that unlike some other cases involving high damages awards, the Plaintiffs in the instant case did have the opportunity to share their childhood and part of their adulthood with their father.

Neither Plaintiff has had to resort to psychological treatment to cope with the loss of their father.  Although specific evidence of Luz's mental and emotional condition was presented by psychiatrist Jorge Suria-Colón, no specific evidence regarding Tony's emotional condition was presented by a psychiatrist who had evaluated him. "Although testimony from a mental health expert is not required to sustain an award for emotional distress, the absence of such evidence is useful in comparing the injury to the award of damages." Koster, 181 F.3d at 35.  "Emotional damages are warranted even without medical or psychiatric evidence, [but] the lack of such evidence is relevant to the amount of award." Id.

With regard to Tony Martínez's damages, another relevant fact is that he spent most of his life geographically separated from his father.  During the majority of his childhood, Tony did not live in the same home as his father.  As an adult, he was stationed in various locations throughout the world for his military service.  He testified that they nevertheless had a close relationship, and that he visited his father each year as his military obligations permitted.

CIVIL NO. 09-2038 (JP)            -18-

     With regard to the decedent's own pain and suffering, the damages awarded must be limited to what Adalberto Martínez experienced while at Ryder.  Therefore, said damages relate to a period of slightly more than twelve hours.  Luz did not testify that her father expressed significant physical pain during that period. As such, the jury was only permitted to award an amount providing compensation for the severe emotional suffering and limited physical pain experienced by Adalberto Martínez during the night that he was at Ryder.

     In light of the evidence presented at trial, the Court finds that the amount of damages awarded by the Jury is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice.  The evidence demonstrated severe injury warranting a large award, but an award of $7,000,000.00 is grossly disproportionate with the evidence.  The Jury was instructed to determine an amount of damages that would provide compensation for the pain and suffering of Plaintiffs and decedent.  The Jury was not permitted to increase the amount awarded in order to provide a penalty, sanction, or punitive damages award.  Under such circumstances, the Court finds that the $7,000,000.00 awarded is outrageous, particularly during the present economic downturn in which the standard of living must come down and all citizens are placing increased value on each dollar.

CIVIL NO. 09-2038 (JP)          -19-

Upon consideration of the specific facts presented in evidence, the Court determines that $3,500,000.00 is the highest award amount that may be supported by the evidence.  Said award would consist of $2,000,000.00 for damages suffered by Plaintiff Luz Martínez, $500,000.00 for damages suffered by Plaintiff Tony Martínez, and $1,000,000.00 for damages suffered by decedent Adalberto Martínez. Accordingly, the Court **GRANTS** Defendants' motions for remittitur. Plaintiffs **SHALL** file an informative motion stating whether they accept the remittitur to a total award of $3,500,000.00 on or before **September 15, 2010.**  In the event that Plaintiffs accept the remittitur, the Court will enter a Final Judgment for $3,500,000.00. In the event that Plaintiffs refuse the remittitur, a new trial will be held as to the issue of damages only.

### B.    Defendants' Motions For Judgment as a Matter of Law

Each Defendant has moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b).  Each Defendant argues that the evidence presented did not support a finding of liability as to the respective Defendant.[8]  Plaintiffs oppose said motions, arguing that adequate evidence was presented to permit the Jury to reach a finding of liability as to all Defendants.  The Court

---

8.    This section of the Opinion and Order addresses each Defendant's respective argument that the evidence presented was insufficient to support a finding of liability against that Defendant.  In some cases, additional distinct arguments were raised by Defendants in their motions for judgment as a matter of law. Those arguments are addressed separately in subsequent sections of the Opinion and Order.

CIVIL NO. 09-2038 (JP)              -20-

will now consider the arguments on this issue as to each of the Defendants.

     **1.**    **Standard for Rule 50 Judgment as a Matter of Law**

Federal Rule of Civil Procedure 50 provides:

**Rule 50. Judgment as a Matter of Law in a Jury Trial; Related Motion for a New Trial; Conditional Ruling**

**(a) Judgment as a Matter of Law.**

    **(1) *In General.*** If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

        **(A)** resolve the issue against the party; and

        **(B)** grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

    **(2) *Motion.*** A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

**(b) Renewing the Motion After Trial; Alternative Motion for a New Trial.** If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.  No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.  In ruling on the renewed motion, the court may:

CIVIL NO. 09-2038 (JP)            -21-

      **(1)** allow judgment on the verdict, if the jury returned a verdict;

      **(2)** order a new trial; or

      **(3)** direct the entry of judgment as a matter of law.

           . . .

Fed. R. Civ. P. 50.

In considering a Rule 50 motion, the Court must view the evidence in the light most favorable to the nonmoving party. <u>Monteagudo</u>, 554 F.3d at 170. A party seeking to overturn a jury verdict "faces an uphill battle" and review is "weighted toward preservation of the jury verdict." <u>Id.</u> (internal quotations omitted). "Courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." <u>Id.</u>

### 2.  Liability of Defendant Griselle Pastrana

Defendant Pastrana moves (No. 163) pursuant to Rule 50 for judgment as a matter of law. Pastrana argues that the evidence presented at trial was insufficient to support a finding of liability against her. In particular, Pastrana argues that the evidence showed that when Adalberto Martínez came to the Ryder emergency room, Pastrana successfully stopped his bleeding. Thereafter, the patient was transferred out of the emergency room and was no longer Pastrana's responsibility. As such, Pastrana contends that there was

CIVIL NO. 09-2038 (JP)          -22-

no evidence indicating that her actions, which were limited to the time when decedent was in the emergency room, contributed to the death.

At trial, the evidence regarding Adalberto Martínez's ongoing bleeding during his time in the emergency room was contested. Pastrana asserted that she had stopped his bleeding, but Plaintiffs presented evidence indicating that the bleeding was ongoing. In particular, Plaintiffs pointed to Ryder's medical record, which stated that when the patient arrived at the medicine floor from the emergency room, he was still bleeding. This contradictory evidence certainly provided a sufficient basis for the jury to conclude that in fact Pastrana had not stopped Adalberto Martínez's bleeding. Applying the standard for a Rule 50 motion, there is no way that the Court can conclude that the evidence on this factual dispute pointed so strongly overwhelmingly in favor of Pastrana that no reasonable jury could have returned a verdict adverse to Pastrana. Therefore, the Court **DENIES** Defendant Pastrana's motion (**No. 163**) for judgment as a matter of law pursuant to Rule 50.

### 3.    Liability of Defendant Juan Ramón Gómez-López

Defendant Gómez similarly argues that the evidence does not support a finding of liability against him because his role in the treatment of Adalberto Martínez was highly limited, and he performed that limited role adequately. Gómez contends that he was merely consulted briefly by a nurse who sought confirmation of existing

CIVIL NO. 09-2038 (JP)          -23-

orders to provide the patient acetaminophen and transfuse the following morning. Gómez asserted at trial that he did not go to see the patient, and that his only involvement was to confirm those two orders, which were correct orders under the circumstances.

Plaintiffs argued at trial that Gómez's actions were inadequate because he was called for a consult regarding Adalberto Martínez's condition, and failed to take the necessary steps to complete that consultation pursuant to the applicable standards of care. In particular, Plaintiffs presented evidence of Ryder's bylaws, which mandate that when an emergency arises and it is not possible to immediately locate the attending physician, Medical Director, or Head of Service, then the emergency room physician must be summoned to take care of the patient until additional help is obtained. Plaintiffs argue that Dr. Gómez was therefore required, pursuant to the bylaws and the general standards of care, to complete a more thorough evaluation and treatment of Adalberto Martínez. Plaintiffs supported their contention regarding Gómez's breach of the applicable standards of care with expert testimony from Dr. Gary Harris.

The Jury credited the evidence presented by Plaintiffs regarding Defendant Gómez's alleged negligence. In light of the testimony and documents presented, the Court determines that the evidence does not point so strongly and overwhelmingly in favor of Defendant Gómez that no reasonable jury could have returned a verdict finding Defendant

CIVIL NO. 09-2038 (JP)            -24-

Gómez liable.  Accordingly, the Court **DENIES** Defendant Gómez's motion

(**No. 181**) for judgment as a matter of law pursuant to Rule 50.

### 4.   Liability of Defendant Enrique Octavio Ortiz-Kidd

Defendant Ortiz argues (No. 185) that the evidence presented was

insufficient to support a finding of liability against him.  Ortiz

focuses on the issue of causation, and argues that under the

applicable Puerto Rico law, the facts of the instant case only

support a finding that Dr. Luis Canetti ("Canetti"), the nonparty

surgeon who saw Adalberto Martínez shortly before his death, was the

cause of the harm.  In support of this theory, Ortiz relies upon the

legal rule that in order to obtain a finding of medical malpractice

liability, "[a] plaintiff must prove, by a preponderance of the

evidence, that the physician's negligent conduct was the factor that

most probably caused harm to the plaintiff."   Lama v. Borrás,

16 F.3d 473, 478 (1st Cir. 1994) (internal citations omitted).

Ortiz attempts to read this rule as establishing that only one

factor may be the factor that "most probably" caused the harm.  In

this case, because Canetti was the last doctor to have an opportunity

to save the patient, Ortiz reasons that all previous negligent actors

are relieved of responsibility.  This interpretation is contrary to

the legal rules regarding situations where multiple actions coincide

to cause a particular harm.  Indeed, even the case law cited by Ortiz

contradicts his theory.  In Lama, the First Circuit states the rule

that liability attaches to a physician whose conduct is shown to be

CIVIL NO. 09-2038 (JP)          -25-

the factor that most probably caused the harm, but then goes on to find that the evidence supported liability against both the individual physician and the defendant hospital. <u>Lama</u>, 16 F.3d at 480-81 ("plaintiffs introduced legally sufficient evidence to support . . . negligence on the part of Dr. Borrás . . . . plaintiffs met their burden of proof as to the allegation that the Hospital's substandard record-keeping procedures delayed the diagnosis and treatment . . . [a]ccordingly, there was no error in the district court's denial of the Hospital's Rule 50(b) motion for judgment as a matter of law.").

In the instant case, Plaintiffs presented evidence regarding the roles played by multiple Defendants in causing the death of Adalberto Martínez. Plaintiffs' theory was that the combined negligence of various actors is the factor that most probably caused the death of the patient. The Jury accepted this theory with regard to all Defendants, which they were entitled to do on the basis of the evidence presented. The fact that Canetti may have been the last physician to have an opportunity to save Adalberto Martínez does not automatically relieve the liability of the other physicians who treated the patient in the hours immediately prior to his death. Therefore, the Court **DENIES** Defendant Ortiz's motion for judgment as a matter of law pursuant to Rule 50.

CIVIL NO. 09-2038 (JP)          -26-

####     5.    Liability of Defendant Ryder Memorial Hospital, Inc.

Defendant Ryder moves (No. 183) pursuant to Rule 50 for judgment as a matter of law to overturn the Jury's finding of liability on behalf of Ryder.   Ryder argues that the evidence cannot support Plaintiffs' theory that Adalberto Martínez died due to loss of blood. In particular, Ryder notes that the autopsy report did not identify exsanguination or hemorrhage as the cause of death.   Ryder contends that the autopsy report must be regarded as the definitive evidence of the cause of death, and all other evidence or testimony to the contrary should be disregarded.   Ryder purports to base this reasoning on the "physical facts rule," which states that testimony that contradicts proven physical facts must be disregarded.

Ryder offers authority for the physical facts rule by citing to a handful of cases from jurisdictions outside of the First Circuit. Even if said cases were of precedential value in the instant case, they do not support the outcome suggested by Ryder.   For example, in the case referred to by Ryder as the leading case establishing the proposed rule, the factual issue involved turned upon the weather conditions on a certain day.   O'Connor v. Pennsylvania R. Co., 308 F.2d 911 (2d Cir. 1962).   Said weather conditions were established by records of the United States Weather Bureau has having consisted of strong winds and heavy snowfall.   Id. at 914.   As a result, the court rejected a factual theory which depended upon the existence of clear weather during the day in question.   Id. at 915.

CIVIL NO. 09-2038 (JP)          -27-

By contrast, in the instant case the cause of Adalberto Martínez's death was legitimately disputed on the basis of testimony and documentary evidence supporting various theories. The causes discussed by the expert witnesses included infection, lack of blood, heart attack, and combinations of two or more such causes. The documentary evidence was also not consistent. As noted by Ryder, the autopsy report listed infection as the cause of death. However, the Death Certificate filled out by Defendant Ortiz listed graft hemorrhage as the cause of death. In addition, the testimony of several fact witnesses supported the finding that Adalberto Martínez was bleeding significantly at several points throughout the evening and early morning.

The Jury determined, on the basis of all of the eyewitness testimony, expert testimony, and documentary evidence, that Plaintiffs' theory as to the cause of Adalberto Martínez's death was correct. There is nothing about the autopsy report that renders it the exclusive source of information regarding the cause of death. It would be reasonable for the Jury to choose to give the autopsy report significant weight, but it is also reasonable for the Jury to give weight to the factual and expert testimony and the Death Certificate filled out by Defendant Ortiz. Therefore, even if the Court were to apply the "physical facts rule," said rule would not compel a specific conclusion regarding the cause of Adalberto

CIVIL NO. 09-2038 (JP)          -28-

Martínez's death.  Accordingly, the Court **DENIES** Defendant Ryder's motion for judgment as a matter of law pursuant to Rule 50.

C.   **Defendants' Additional Arguments For Judgment as a Matter of Law or New Trial**

In addition to each Defendant's Rule 50 motion on the basis of the argument that the evidence was insufficient to support a finding of liability against the respective Defendants, additional arguments were raised by Defendants in their motions for judgment as a matter of law or a new trial.  The Court will now address those arguments.

1.   **Defendant Ortiz's Argument That Evidentiary Rulings Require A New Trial**

Defendant Ortiz argues (No. 185) that certain evidentiary rulings made during the course of trial were erroneous and unfairly prejudiced Ortiz's case.  First, Ortiz argues that the entire group of prospective jurors should have been dismissed following comments made by one prospective juror regarding a prior negative experience she had with Ryder hospital.  After said comments were made during the voir dire process, the prospective juror who made the comments was dismissed, and the Court gave a specific instruction to the remaining jurors to disregard her comments.  The Court also instructed the jurors prior to trial and immediately before deliberations that they must decide the case upon the basis of the evidence presented and reasonable inferences to be drawn therefrom. Moreover, the Court permitted all parties to offer additional voir dire questions at any point during the selection process.

CIVIL NO. 09-2038 (JP)           -29-

In light of the particular circumstances, the Court finds that the comments made by the prospective juror did not cause prejudice to Ortiz or any of the other Defendants.  See <u>Correia v. Fitzgerald</u>, 354 F.3d 47, 53 (1st Cir. 2003) (finding that no prejudice existed where one juror was excused after expressing his bias and court had offered counsel the opportunity to ask additional voir dire questions and had specifically instructed the selected jurors to decide the case solely on the evidence).

Defendant Ortiz also argues that the Court erred in permitting Plaintiffs' counsel to make certain statements during their opening statement and closing argument.  Specifically, Ortiz argues that Plaintiffs' opening statement improperly made arguments instead of stating facts and law.  Ortiz also contends that during their closing argument, Plaintiffs' counsel impermissibly appealed to juror sympathy and misstated facts and law.

In the absence of an objection raised during trial, Ortiz forfeits these arguments.  <u>National Union Fire Ins. Co. of Pittsburgh, PA v. West Lake Academy</u>, 548 F.3d 8, 22 (1st Cir. 2008). Under such circumstances, the argument is not entirely waived, but is subject to plain error review.  Under plain error review, a forfeited objection will only be considered if:

> (1) an error was committed; (2) the error was "plain" (i.e. obvious and clear under current law); (3) the error was prejudicial (i.e. affected substantial rights); and (4) review is needed to prevent a miscarriage of justice.

CIVIL NO. 09-2038 (JP)          -30-

Smith v. Kmart Corp., 177 F.3d 19, 26 (1st Cir. 1999).

     Here, Ortiz has not satisfied the elements for plain error review.  With regard to the prospective juror's comment, Ortiz cites no case law, let alone law indicating that there was an obvious and clear error.   With regard to Plaintiffs' opening statement and closing argument, Ortiz cites cases from other jurisdictions, which do not have precedential value in this Court and are therefore not sufficient to establish an error that was obvious and clear under current law.  Because Ortiz's arguments fail to establish the first and second elements, the Court need not proceed to consider the subsequent elements, which would set an additional high hurdle requiring a showing of prejudice resulting in a miscarriage of justice.  Accordingly, Defendant Ortiz's motion (**No. 185**) for a new trial on the basis of purported errors in evidentiary rulings is **DENIED.**

> **2.   Defendant Ryder's Argument That the Evidence Could Not Support a Finding of 70% Liability Against Ryder**

     Defendant Ryder argues (No. 184) that the legal rules applicable to hospital liability in Puerto Rico must have been misapplied because the evidence presented does not support a finding of 70% fault by Ryder.  In particular, Ryder argues that the actions of Defendants Ortiz, Gómez, and Pastrana, as well as those of nonparty Canetti, cannot be attributed to Ryder.  Ryder reasons that because these doctors actions were primarily responsible for the damages

CIVIL NO. 09-2038 (JP)                -31-

suffered, the hospital itself cannot be found responsible for 70% of the harm.

Defendant Ryder correctly cites to a case which states Puerto Rico law on the issue of a hospital's responsibility for actions by doctors working at the hospital.  Unfortunately for Ryder, said law does not support the outcome Ryder requests in the instant case.  As stated by the Puerto Rico Supreme Court:

> when a person goes directly to a hospital for medical treatment and the hospital "provides" the physicians who treat him, we favor the joint liability of hospital and private physician for the act of malpractice. Within this factual framework, we hold that it makes no difference whether the attending physician is a hospital employee or not, or a physician granted a "franchise" to offer his specialized medical services to the hospital patients, or a physician belonging to the hospital staff and called in for consultation to treat the patient, etc.

> In the first place, in this type of situation the hospital is the one that "provides" the service of the physician, and the patient usually has no option or participation in said choice. To a certain point one can affirm that in this type of situation the hospital is "guaranteeing" to the patient that said physician, or any other who treats him under those circumstances, is a competent physician who is fit to render medical assistance. Possibly, on account of that "implied guarantee" on the hospital's part is that the patient goes to that particular institution and not to another, or to a physician at his private office. In the second place, from the patient's point of view what he has in "front" of him is the institution as such, not physicians independent and distinct from each other and from the hospital. In other words, for the patients and general public that enter its premises, the hospital nowadays is a total health care institution and not a building where health-care professionals go privately about their business with no further contact with each other. Under these circumstances, it is not unreasonable to apply the doctrine of "apparent or ostensible agency." In the third place, there is no doubt

CIVIL NO. 09-2038 (JP)          -32-

> that when a "patient" goes directly to the hospital, the
> main relationship established is between the patient and
> the hospital administration. In this case, the physician
> is seen as an assistant of the hospital, and the
> institution should be held directly liable for the damage
> caused by the physician. And last, although the unsalaried
> physician could be considered an "independent contractor,"
> there is no doubt that the hospital is the main
> beneficiary of the work done by the physician, and as such
> the institution should be held liable for the negligent
> acts of the physician.

Márquez-Vega v. Martínez-Rosado, 116 D.P.R. 397 (1985) (internal

citations omitted).

     The Puerto Rico Supreme Court's discussion in Marquez Vega makes

clear that Ryder is responsible for the actions of physicians which

it provided to Adalberto Martínez.  As such, Ryder is responsible for

the actions of Defendants Pastrana and Gómez, as well as Canetti.

Under these circumstances, it is not surprising that the Jury

concluded that Ryder is 70% at fault for the damages caused.

Moreover, evidence was also presented regarding the actions of the

nursing staff at Ryder, whose negligence may also be attributed to

Ryder.  Accordingly, the Court finds that the Jury's conclusion

regarding the proportion of fault attributable to Ryder is supported

by the evidence and the applicable law.  Therefore, Ryder's motion

(**No. 184**) to alter judgment is **DENIED**.

     D.   **Defendant Ryder's Motion Asserting Lack of Jurisdiction**

     Defendant Ryder moves (No. 182) to set aside the Judgment

pursuant to Rule 60(b)(4).  Ryder argues that the Judgment is void

because the Court lacked jurisdiction to hear claims asserting

CIVIL NO. 09-2038 (JP)          -33-

damages suffered by decedent Adalberto Martínez.  Ryder contends that
said claims must be brought by all members of decedent's estate.
Because Defendants are citizens of Puerto Rico and the nonparty heirs
of Adalberto Martínez are also citizens of Puerto Rico, naming those
individuals as Plaintiffs in the action would destroy diversity.
Therefore, Ryder argues that there was no diversity jurisdiction in
the instant case.

Under Puerto Rico law, the cause of action for the pain and
suffering experienced by a decedent prior to death may be recovered
by the decedent's heirs.  <u>Arias-Rosado v. González Tirado</u>,
111 F. Supp. 2d 96, 98 (D.P.R. 2000).  In such cases, the estate or
"sucesión" of the decedent is not a separate legal entity on behalf
of which a lawsuit may be brought.  <u>Id.</u> at 98-99.  However, "[t]he
fact that the succession is not an entity separate and apart from its
members does not mean that all of its participants must always appear
together to assert or defend matters affecting the estate."[9]

---

9.   In addition to the cited <u>Arias-Rosado</u> case, other cases in this District have
similarly concluded that an action to recover pain and suffering by a decedent
may proceed when some but not all heirs are named parties.  <u>Ruiz-Hance v.
Puerto Rico Aqueduct and Sewer Authority</u>, 596 F. Supp. 2d 223,
229 (D.P.R. 2009); <u>Rodríguez-Rivera v. Rivera-Ríos</u>, 2009 WL 563221 at *3
(D.P.R. March 5, 2009); <u>Meléndez-Ortiz v. Corporación del Centro Cardiovascular
de Puerto Rico</u>, 2006 WL 2382016 at *2 (D.P.R. August 16, 2006).  Defendant
Ryder moves (No. 197) for the Court to take note of a recent decision from this
District reaching the opposite result, <u>Maribel Cruz-Gascot v. HIMA San Pablo
Hospital Bayamón, et al.</u>, 08-2080 (FAB).  The Court **NOTES** Ryder's motion
(**No. 197**).  However, the Court agrees with the majority of the decisions in
this District, which correctly determine that, under the applicable precedent
from the Puerto Rico Supreme Court, it is not necessary to include every heir
of the decedent as a named party.  In addition, the Court notes that the
procedural posture of this case is distinct from that in <u>Cruz-Gascot</u>, where the
issue regarding the nonparty heirs was raised prior to trial.

CIVIL NO. 09-2038 (JP)          -34-

<u>Id.</u> at 99.  Individual members of an estate may bring a cause of action without the other members being named as parties.  <u>Id.</u>  In such cases, if the appearing members of the estate prevail, their recovery is for the benefit of all members of the estate.  <u>Id.</u> Accordingly, the Court finds that the appearance of Plaintiffs Luz and Tony Martínez seeking to recover damages for Adalberto Martínez's pain and suffering is in accordance with Puerto Rico law.

In addition, the unnamed heirs are not necessary parties pursuant to Rule 19.  Rule 19(a)(1) provides:

>    **(a) Persons Required to Be Joined if Feasible.**
>
>        **(1)** ***Required Party.*** A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
>            **(A)** in that person's absence, the court cannot accord complete relief among existing parties; or
>
>            **(B)** that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>                **(i)** as a practical matter impair or impede the person's ability to protect the interest; or
>
>                **(ii)** leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

In the instant case, the absence of the additional heirs as named parties does not prevent the Court from according complete

CIVIL NO. 09-2038 (JP)               -35-

relief among the parties.  The nonparty heirs do possess an interest
related to the subject matter of the action, but their absence does
not impede their ability to protect that interest.  On the contrary,
the interest of the nonparty heirs is aligned with the interest of
the named heirs, and said interest has been protected by the diligent
representation provided by Plaintiffs' counsel.  Nor does the absence
of the nonparty heirs leave an existing party subject to a risk of
incurring double, multiple, or otherwise inconsistent obligations.
The Defendants' obligations in connection with the pain and suffering
of Adalberto Martínez are limited to the award in this case.
Plaintiffs have notified the state court, in which a separate
proceeding had been filed, that the issue of decedent's pain and
suffering has been adjudicated and need not be considered further by
the state court.

     Thus, the nonparty heirs of Adalberto Martínez are not necessary
parties in the instant action.  Application of the language of
Rule 19(a) indicates that none of the conditions that make it
necessary to include a particular person as a party are present here.
Moreover, the Puerto Rico law regarding causes of action by members
of an estate permits individual members to bring a cause of action
for the decedent's pain and suffering, without the need to name all
members of the estate as parties.  As such, the Court finds that Luz
and Tony Martínez were entitled to bring a cause of action for the
pain and suffering of their late father.  Because only Luz and Tony

CIVIL NO. 09-2038 (JP)            -36-

were named as Plaintiffs, diversity jurisdiction exists and the cause of action for Adalberto Martínez's pain and suffering was properly before the Court.

### E.   __Plaintiffs' Motion to Amend / Correct Judgment__

Plaintiffs move (No. 157) to amend / correct the Final Judgment (No. 156) to provide that Defendants are jointly and severally liable for the full amount of the Judgment.  Said motion is unopposed.[10] The Judgment currently states the total amount awarded to each Plaintiff, the percentage of responsibility attributed to each Defendant, and a breakdown of specific amounts owed by each Defendant to each Plaintiff based upon said percentages.  Plaintiffs argue that the specific amounts owed by each Defendant to each Plaintiff should be eliminated from the Judgment.

The verdict form in the instant case was discussed by the parties and agreed upon at the Pretrial Conference on May 28, 2010. Said form (No. 148) included questions asking the Jury to assess: (1) whether each Defendant was liable for negligence; (2) the amounts of damages sustained by each Plaintiff and by decedent; (3) apportionment of damages; and (4) comparative negligence of Luz Martínez-Álvarez.  The question regarding apportionment stated:

---

10.   Defendants Ortiz, Gómez, and Pastrana offered no opposition to Plaintiffs' motion to amend/correct the Final Judgment.  Defendant Ryder moved (No. 166) for an extension of time to oppose Plaintiffs' motion.  The Court denied (No. 168) Ryder's motion for extension.  Ryder attempted to evade the Court's Order denying an extension of time by offering its opposition arguments in a document (No. 171) titled "Motion for Reconsideration and Leave to File Reply in Opposition."  The Court struck Ryder's belated opposition from the record (No. 176).

CIVIL NO. 09-2038 (JP)          -37-

        If you found **more than one** Defendant liable in
    Question 1, then state what percentage fault is
    attributable to each of the Defendants that you found
    liable.  The total of all such fault or negligence should
    be 100%.  If you found some but not all Defendants liable,
    do not enter a percentage next to the name(s) of any
    Defendant(s) whom you found not liable.

        **RYDER MEMORIAL HOSPITAL, INC.**      _____%
        **DR. GRISELLE PASTRANA**              _____%
        **DR. ENRIQUE OCTAVIO ORTIZ-KIDD**     _____%
        **DR. JUAN GÓMEZ-LÓPEZ**               _____%

In response to this question, the Jury assigned percentages of fault

as follows: Ryder: 70%; Pastrana: 5%; Ortiz: 20%; and Gómez: 5%.

    In support of Plaintiffs' argument that they should be able to

obtain recovery of the full amount of the Judgment from any

Defendant, Plaintiffs refer to Puerto Rico cases in which multiple

tortfeasors are held jointly and severally liable.  For example, in

Torres-Ortiz v. E.L.A., the Puerto Rico Supreme Court found that when

the negligent acts of multiple defendants combine to cause a

particular harm, the defendants are jointly and severally liable.

Torres-Ortiz v. E.L.A., 136 D.P.R. 556 (1994).  As such, each

defendant is fully liable for the entirety of the damages.  Id.  The

plaintiff may recover the full amount of damages from any defendant,

as long as the plaintiff does not obtain a total amount greater than

the total damages awarded.  Id.

    Like in the instant case, Torres-Ortiz involved a situation in

which specific percentages of fault had been assigned to specific

defendants.  Among the three defendants found liable, one was found

CIVIL NO. 09-2038 (JP)          -38-

to be 75% responsible for the damages caused, a second for 15%, and the third for 10%. Id. at 559. The assignment of these percentages, however, did not alter the joint and several character of the liability for the total amount of damages. Instead, the percentages of fault were assigned only for purposes of the internal relations between the defendants. In the event that one defendant ends up paying more than his percentage share to the plaintiff, that defendant may seek recovery from the other defendants through an action for "nivelación." Id.

The First Circuit has also acknowledged that the doctrine of joint and several liability is applicable under Puerto Rico law. In Ruiz-Toche v. Pepsi Cola of Puerto Rico Bottling Co., the First Circuit noted that "Puerto Rico is a comparative negligence jurisdiction that imposes joint and several liability on joint tortfeasors." Ruiz-Toche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 87 (1st Cir. 1998). In light of the applicable Puerto Rico law doctrine of joint and several liability, the Court **GRANTS** Plaintiffs' motion (**No. 157**) to amend the Judgment. An amended Judgment will be entered stating that Defendants are jointly and severally liable for the full amount of the damages awarded.

### F.    **Plaintiffs' Motion for Express Finding of Obstinacy**

Plaintiffs move (No. 162) for an express finding by the Court that Defendants acted obstinately during the course of the litigation. Plaintiffs argue that the Court's Supplemental Judgment

CIVIL NO. 09-2038 (JP)          -39-

(No. 158) awarding attorneys' fees constituted an implied finding of obstinacy.  Plaintiffs further assert that said finding was justified because Defendants unnecessarily prolonged the litigation by proceeding all the way to trial with defenses that they knew would not succeed.  Plaintiffs contend that Defendants pursued unsupported legal theories and strategies, including arguing facts that were not in the medical record.

     Plaintiffs cite to Puerto Rico Rule of Civil Procedure 44.1(d), which provides:

> In the event any party or its lawyer has acted obstinately or frivolously, the court shall, in its judgment, impose on such person the payment of a sum for attorney's fees which the court decides corresponds to such conduct.

This Rule is considered substantive rather than procedural, and is therefore applicable in diversity cases before this Court. Quiñones-Pacheco v. American Airlines, Inc., 979 F.2d 1, 7 n.8 (1st Cir. 1992).  Explaining the standard for a finding of obstinacy, the First Circuit has stated that:

> A finding of obstinacy requires that the court determine a litigant to have been unreasonably adamant or stubbornly litigious, beyond the acceptable demands of the litigation, thereby wasting time and causing the court and the other litigants unnecessary expense and delay.

De León-López v. Corporación Insular de Seguros, 931 F.2d 116, 126 (1st Cir. 1991).

CIVIL NO. 09-2038 (JP)              -40-

     In addition, Plaintiffs request the imposition of pre-judgment
interest pursuant to Puerto Rico Rule of Civil Procedure 44.3(b),
which states:

> Except when the defendant is the Commonwealth of Puerto
> Rico, its municipalities, agencies, instrumentalities or
> officers acting in their official capacity, **the court will
> also impose on the party that has acted rashly the payment
> of interest** at the rate fixed by the Board by virtue of
> the previous subsection which is in effect at the moment
> the judgment is pronounced, from the time the cause of
> action arises in every case of collection of money and
> **from the time the claim is filed in actions for damages
> until the date judgment is pronounced**, to be computed on
> the amount of the judgment. The interest rate shall be
> stated in the judgment.

(emphasis added). Defendants oppose Plaintiffs' motion, arguing that
their litigation strategies were pursued in good faith, and were not
carried out obstinately, frivolously, or rashly.

     In the instant case, the trial and pretrial stages of the
litigation were hard-fought.  The parties called upon numerous
experts and factual witnesses over the course of two weeks of trial.
Evidentiary issues and other legal questions were disputed
vigorously.  In settlement discussions, the parties were far apart
in terms of their valuation of the case.  When the case was finally
submitted to the Jury, the Jury found in favor Plaintiffs.

     Having observed the efforts of counsel for all parties in this
case, the Court finds that the course of the litigation was the
result of honest disagreement and diligent advocacy, not obstinacy,
rashness, or frivolousness. Defendants pursued strategies which they

CIVIL NO. 09-2038 (JP)          -41-

believed would be victorious.  Many of the issues in the case turned

upon highly complex assessments of medical issues.   To further

complicate matters, the evidence presented through testimony and

documentary evidence was mixed and in many cases did not clearly lead

to any single conclusion.   Most notably, the primary cause of

Adalberto Martínez's death, whether by loss of blood, heart attack,

infection, or preexisting conditions, was hotly disputed.

     The fact that the Jury ultimately agreed with Plaintiffs does

not automatically lead to the conclusion that Defendants were

unreasonably adamant or stubbornly litigious, beyond the acceptable

demands of the litigation, thereby wasting time and causing the Court

and the other litigants unnecessary expense and delay.  "Indeed, even

if a party's claim ultimately fails, it cannot be deemed frivolous

or obstinate for that reason alone."   Dopp v. Pritzker,

38 F.3d 1239, 1254 (1st Cir. 1994).   Under the particular

circumstances of the instant case, the Court declines to find that

Defendants acted obstinately, frivolously, or rashly.  Therefore, the

Court **DENIES** Plaintiffs' motion for express finding of obstinacy

(**No. 162**) and **VACATES** the Supplemental Judgment (No. 158) awarding

attorneys' fees.

## IV.   CONCLUSION

     In conclusion, the Court hereby **GRANTS** Plaintiffs' motion to

amend the Judgment (No. 157); **GRANTS** Defendants motions for

CIVIL NO. 09-2038 (JP)            -42-

remittitur (Nos. 163, 181, 185, and 186); and **DENIES** all other motions discussed herein.

      **IT IS SO ORDERED.**

      In San Juan, Puerto Rico, this 27th day of August, 2010.


                                 s/Jaime Pieras, Jr.
                                     JAIME PIERAS, JR.
                          U.S. SENIOR DISTRICT JUDGE